## 1442. CRUMLEY v. THE STATE.

1. If a long period intervenes between the threat and the act, and there are opportunities of doing the threatened injury and no attempt to do it, the probative force of the threat would be greatly weakened. If between the threat and the act a feeling of ill-will which inspired the threat has changed to a feeling of good will and friendly relations, the probative value of the threat would be negligible.

2. The res gestæ which show a shooting to have been accidental are sufficient to overcome any inference of intentional shooting, arising from proof of threats.

3. To constitute an assault with intent to murder, malice and intent to kill must appear. The evidence in this case shows neither malice nor the intent to kill, and the verdict must be set aside as contrary to law.

Indictment for assault with intent to murder, from Pulaski superior court—Judge Martin. October 5, 1908.

Argued November 10,—Decided November 24, 1908.

*W. L. & Warren Grice,* for plaintiff in error.    ·

*E. D. Graham, solicitor-general,* contra.

HILL, C. J. Miles Crumley was indicted for the offense of assault with intent to commit murder, and on his trial was convicted and sentenced to a term of two years in the penitentiary. He made a motion for a new trial, based on the general grounds and on one special ground. This motion was overruled. The view that this court takes of the evidence makes it unnecessary to consider the special exception.

The facts may be substantially stated as follows: Miles Crumley, a white boy about 17 years of age, with his brother Lee, on the night of the alleged offense, was on a visit to their brother Tom and his wife. Tom and his wife intended to move on the following day, and Miles and Lee went to the house for the purpose of assisting in the work of moving, and were invited to remain all

night, so as to be present the next morning for that purpose. Tom and his wife were lying on a bed, and Miles was sitting in the room. Lee had not accepted the invitation to remain all night and had gone home. Tom got up from the bed for the purpose of replenishing the kerosene lamp, which was burning low, and asked Miles to help him fill the lamp with oil. Miles saw a pistol lying on his brother's pants on the floor. He took up the pistol, and, according to both Tom and wife, was "pranking" with it, and the pistol went off and the ball hit the woman (who was still lying on the bed) in the breast. Miles, seeing what he had done, immediately dropped the pistol, began crying, exclaiming that he did not intend to shoot his sister-in-law, and went immediately for the doctor, and brought him to the house. Only the three were in the house at the time of the shooting, and both Tom and his wife testified that Miles was "pranking" or fooling with the pistol, when it went off accidentally; and the defendant declared that the shot was accidental.

There is no circumstance or inference fairly and reasonably deducible from any fact in connection with the actual shooting, either before or at the exact moment of the shooting, or immediately afterwards, that tends to show any criminal intent, either to shoot or to kill. And if a consideration of the evidence is confined to the res gestæ of the transaction, accidental shooting is the only reasonable hypothesis. But it is claimed by the State that the defendant had, several months previous to the act of shooting, made threats to shoot or to kill his sister-in-law, and it is insisted by the State that the act of shooting was the carrying out of a previously-formed intention to shoot or to kill as proved by the threat. This threat was shown by the testimony of four witnesses, the four witnesses swearing to one threat, and not to four different threats made at different times. The time when this threat was made by the defendant to kill his sister-in-law is not definitely fixed by the testimony. "It was some time before the shooting occurred," and was made at the house of the witnesses, while the defendant was talking about the marriage of his brother, and the exact language of his threat, as remembered by the witnesses, was as follows: alluding to the marriage of his brother Tom with Georgia Wiggins, the defendant said, "before Tom should live with Georgia Wiggins, he would kill her before the year was out." When his brother first

married this woman, there was opposition in the family to the marriage, on account of her character, and there was some feeling in reference to the marriage; and it is reasonable to presume that it was during the existence of this state of feeling that Miles gave utterance to the threat. The time intervening between the expression of the threat and the act of shooting had removed all feeling of antagonism or dissatisfaction to Tom's marriage, and the relation between Tom's wife and his brother and his family was entirely pleasant. The probative value of this threat must be considered in connection with this change in the sentiment of the defendant and his family towards the marriage. A threat made during the existence of ill feeling should have little weight as proof of malice, which is not carried into execution until after the ill feeling has disappeared and kindly feeling and pleasant relations exist between the one who threatened and the one who is threatened. *Stark* v. *State,* 81 *Ga.* 596 (7 S. E. 807). Can it be doubted, under the facts of this case, that the threat uttered by this boy, if in fact he did utter it, was the mere careless, thoughtless utterance or ebullition of temporary passion, resulting from the family opposition to his brother's marriage? The time intervening between the threat and the act should greatly impair its probative force, and the additional change of ill will to sentiments of good will should still further diminish its probative value. If the boy had intended to do what he is said to have threatened, why did he not carry out his intention? There were doubtless many opportunities for him to have done so. Instead of any effort to carry out his threat, the evidence shows that the cause for his ill will had entirely disappeared, and that, at the time of the shooting, not only were his relations pleasant towards his brother and his sister-in-law, but on that night he was in his brother's house as his guest for the night, on the invitation of his sister-in-law, for the friendly purpose of assisting the two on the next day in moving to another home. Is it conceivable that a boy of seventeen could have been such an adept in hypocrisy as to have been able to conceal a malignant spirit and to have executed a malignant design while engaged in friendly and brotherly intercourse and association, tendering services of good will and accepting the hospitality of a relative whom he was but waiting a favorable opportunity to murder? To constitute an assault with intent to murder there must exist

the element of malice. The undisputed evidence which proves the friendly and pleasant relations between the parties, the express declaration of the woman assaulted and her husband that the shooting was accidental, the evidence that the boy did not bring any pistol to the house with him, but that, seeing the pistol of his brother lying on the floor, he picked it up and, in the language of the witnesses, was "pranking" with it, and the conduct of the boy when he realized what he had done, prove, it seems to us, beyond all controversy, that the unfortunate act was wholly unintentional, and that the verdict of guilty is not only without evidential support, but is in direct antagonism to the truth as shown by the evidence.          *Judgment reversed.*